**John J. ADAIR, Inspector General of the Resolution Trust Corporation, Petitioner,**

v.

**ROSE LAW FIRM, A Professional Association, Respondent.**

**Misc. No. 94–0278 PLF.**

United States District Court, District of Columbia.

Nov. 16, 1994.

John H. Korns and Paul M. Laurenza from Pettit & Martin, Washington, DC, Patricia M. Black from Office of the Inspector General, Rosslyn, VA, for petitioner.

Walter B. Stuart, C. Michael Buxton and Alden L. Atkins from Vinson & Elkins, L.L.P., Washington, DC, for respondent.

## OPINION AND ORDER

FRIEDMAN, District Judge.

This case is before the Court on the Petition of the Inspector General of the Resolu-

tion Trust Corporation For Summary Enforcement of an Administrative Subpoena Duces Tecum and the Motion of Respondent Rose Law Firm for a Protective Order. The Court has determined that the subpoena should be enforced, as narrowed by the Petition and the representations of counsel that Rose may produce a list of Rose's clients for the relevant period and need not produce the other client-identifying documents originally sought. In view of the revised Confidentiality Undertaking and the additional protections now offered by the Inspector General, the Court denies Rose's Motion for a Protective Order.

## I. BACKGROUND

 In response to the savings and loan imbroglio, Congress created the Resolution Trust Corporation in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). 12 U.S.C. §§ 1441a(b), 1811 *et seq.* The RTC acts as receiver for failed thrifts and succeeds to the entirety of each association's rights, assets and obligations. 12 U.S.C. §§ 1821(d)(2)(A), (B).[1] FIRREA requires the RTC to maximize the net present value of thrift assets, minimize the impact of its transactions on local real estate and financial markets, make efficient use of government funds and minimize any loss from resolution of cases. 12 U.S.C. § 1441a(b)(3)(C). To facilitate the completion of the RTC's duties, FIRREA authorizes the RTC to contract with private law firms and others in the private sector to obtain services. 12 U.S.C. § 1441a(b)(10)(A).

Since 1989, the Rose Law Firm has entered several legal service agreements with the Federal Deposit Insurance Corporation and the RTC to provide them with legal services with respect to a number of failed thrift institutions; and it continues to represent the RTC. Declaration of John J. Adair, RTC Inspector General ("Adair Decl.") ¶ 4; Declaration of Clark W. Blight, Assistant Inspector General for Investigation ("Blight Decl.") ¶ 5; Second Affidavit of Ronald M. Clark, chief operating officer of Rose ("Clark Aff.") ¶¶ 4, 5. These service agreements, as well as retainer letters, FDIC and RTC guidelines and policies, and RTC regulations, 12 C.F.R. Part 1606, imposed obligations on Rose to disclose, and to certify that it had disclosed, all actual or potential conflicts of interest to the FDIC and the RTC. Blight Decl. ¶ 6.[2] Rose certified that it had found no conflicts of interest that had not already been waived. Adair Decl. ¶ 4; Blight Decl. ¶ 6.

In addition to retaining Rose for other engagements, the FDIC retained the firm to represent the interests of the FDIC and later the RTC as conservator of Madison Guaranty Savings and Loan Association in litigation against Frost & Company, an accounting firm. Adair Decl. ¶ 5. Clark Aff. ¶ 6. In 1993, allegations surfaced that Rose had not disclosed actual or potential conflicts in this matter. Adair Decl. ¶ 5; Blight Decl. ¶ 7; Clark Aff. ¶ 7. The RTC's Office of Contractor Oversight and Surveillance ("OCOS") reviewed the allegations and issued a report on February 8, 1994. The FDIC Legal Division also issued a report regarding conflict of interest issues on February 17, 1994. Adair Decl. ¶ 6; Blight Decl. ¶ 8.

During a hearing before the Senate Committee on Banking, Housing and Urban Affairs on February 24, 1994, certain Senators criticized the FDIC and RTC reports and requested that the Inspector General of the RTC conduct an independent investigation of the matters addressed by the OCOS report. Adair Decl. ¶ 7; Blight Decl. ¶ 9. On March

---

**1.** *See also* 12 U.S.C. § 1441a(b)(4)(A) (granting RTC "the same powers and rights to carry out its duties" as the Federal Deposit Insurance Corporation has under 12 U.S.C. §§ 1821–1823).

**2.** The actual or potential conflicts that Rose was required to disclose include participation of any partner or associate of the firm as a director or officer of any insured institution that has failed or that is the subject of any ongoing supervisory action; representation of an officer, director,

debtor, creditor or stockholder of any failed or assisted institution in a matter related to the FDIC or RTC; representation of a creditor whose claim competes with that of the FDIC or RTC; the existence of any outstanding loans from a failed institution on which any partner or associate of the firm is a borrower or guarantor; and representation of a client in a matter adverse to the FDIC or RTC. Blight Decl. ¶ 6.

2, 1994, John E. Ryan, Deputy CEO of the RTC, sent a formal request to the Inspector General of the RTC to conduct such an investigation. Adair Decl. ¶ 8; Blight Decl. ¶ 10.

The IG immediately initiated an investigation of the Rose Law Firm to determine whether Rose had failed to disclose to the FDIC and later the RTC any actual or potential conflicts of interest on matters for which it was retained by the FDIC or the RTC; whether any such failures violated any laws, regulations, agreements, guidelines or policies; and whether the FDIC and the RTC properly conducted their review of any such conflicts. Adair Decl. ¶¶ 9–10; Blight Decl. ¶ 11. Under the Inspector General Act, the IG must report his findings and recommendations to the head of the RTC, to the Congress and, if he believes there has been a violation of criminal law, to the Attorney General. 5 U.S.C.App. 3 §§ 4(d), 5.

As a first step in its investigation, the IG sought to identify conflicts of interest by reviewing and comparing the identities of Rose's clients against the records of the RTC and of the failed institutions for which Rose provided legal services. Adair Decl. ¶ 11; Blight Decl. ¶ 13. On April 18, 1994, the IG issued a subpoena duces tecum to the Rose Law Firm for information regarding the firm's clients. The subpoena demanded the production of

> [a]ny documents listing the names of any individual, partnership, corporation, association or other person or entity to whom the Rose Law Firm ... provided legal services at any time or from time to time during the period from January 1, 1985 through April 15, 1994. The documents to be produced may consist of a single list, or multiple lists, identifying clients during such period.

Rose failed to produce the documents requested, and the IG petitioned this Court to enforce its subpoena.

On September 8, 1994, Respondent moved the Court to transfer the case to the United States District Court for the Eastern District of Arkansas. Rose argued that an evidentiary hearing was required to determine whether the subpoena was too burdensome and whether the IG issued the subpoena for an improper purpose. Rose claimed that the witnesses and documents regarding those issues are located in Little Rock and urged the Court to transfer the case there for the convenience of the parties and witnesses. Rose's burdensomeness argument was based on its conviction that it would have to produce all documents containing client names to satisfy the subpoena. This argument was undermined when the IG assured Rose that it could respond to the subpoena by producing a client list or lists and no other documents.

The Court denied Respondent's motion to transfer. It noted that a subpoena enforcement action is a summary proceeding and found that Respondent had failed to prove that "extraordinary circumstances" existed that would justify an evidentiary hearing. See FTC v. Invention Submission Corp., 965 F.2d 1086, 1091 (D.C.Cir.1992), cert. denied, — U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993). The Court concluded that Rose could use affidavits rather than the testimony of witnesses to address the issue of burdensomeness. The Court also rejected Rose's argument that improper political pressure from members of Congress induced the IG to initiate the investigation that led to the issuance of the subpoena. The Court found that Rose had failed to make the required threshold showing that members of Congress exerted undue influence or control over the IG's investigation that caused the IG to initiate the investigation or issue the subpoena in bad faith or for improper purposes. See FTC v. Invention Submission Corp., 965 F.2d at 1091; United States v. Aero Mayflower Transit Co., Inc., 831 F.2d 1142, 1145–47 (D.C.Cir.1987).

On October 7, 1994, Petitioner and Respondent entered into a Memorandum of Understanding that describes how the Rose Law Firm may comply with the subpoena by providing client lists and no other documents. Appendix A. The Memorandum specifies the client lists that Rose will provide if the Court enforces the subpoena. As a result, Respondent has abandoned its burdensomeness argument and has submitted no affidavits regarding the onerousness of complying with the subpoena.

## II. DISCUSSION

In opposing the IG's petition, the Rose Law Firm argues that the Inspector General's subpoena exceeds his statutory authority. Rose also argues that if the Court enforces the subpoena, the Court should grant its motion for a protective order, which would more closely control the IG's use of the subpoenaed information than the Confidentiality Undertaking the IG has offered.

### A. The Subpoena Was Within The Authority Of The Inspector General

■ In enforcing an administrative subpoena, the Court's role is limited to determining whether the subpoena is issued for a lawful purpose within the statutory authority of the agency that has issued it, whether the demand is sufficiently definite and not unduly burdensome, and whether the subpoena seeks information reasonably relevant to the agency's investigation. *RTC v. Walde*, 18 F.3d 943, 946 (D.C.Cir.1994); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1513 (D.C.Cir.1993); *FTC v. Invention Submission Corp.*, 965 F.2d at 1089. Rose does not oppose the IG's subpoena on the grounds that it seeks irrelevant information, that it is indefinite or that it is unduly burdensome. Respondent does assert, however, that the IG's investigation exceeds his statutory authority.[3]

■ Rose argues that the Inspector General Act, by its language and legislative history, limits Inspectors General to investigating only the internal operations of federal departments and agencies. It maintains that the IG's investigation should be limited in its scope to determining whether the RTC properly conducted its review of any conflicts of interest and should not extend to a *de novo* review of any potential or actual conflicts that Rose may have had that were not considered by the OCOS. The Court disagrees.

The Inspector General Act grants Inspectors General authority to conduct investigations and audits:

It shall be the duty and responsibility of each Inspector General ... to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of [the agency].

5 U.S.C.App. 3 § 4(a)(1). Respondent argues that "relating to the programs and operations of" the agency is limiting language that restricts the IG to internal investigations of the agency's own conduct. The Court does not accept this construction of the statute and finds the "relating to" language a broad grant of authority rather than a limitation. This language is expansive enough to extend the IG's authority beyond investigations of the agency itself to investigations of individuals and entities outside the agency involved with an agency's programs. Furthermore, other sections of the Inspector General Act clarify, if clarification is needed, that the IG's authority extends to conducting audits and investigations of programs that the agency finances, including investigations into alleged fraud, abuse and waste by government contractors and other recipients of government funds in connection with those programs.

Section 2 of the Inspector General Act states that the purpose for the creation of independent offices of Inspectors General in various agencies was to provide "independent and objective units ... to conduct and supervise audits and investigations relating to the programs and operations of" such agencies and "to provide leadership and coordination and recommend policies for activities designed ... to prevent and detect fraud and abuse in, such programs and operations...." 5 U.S.C.App. 3 § 2. Sections 4(a)(2) through 4(a)(5) grant to Inspectors General the responsibility for conducting reviews and making recommendations regarding fraud, abuse and waste in programs administered or financed by the agency. 5 U.S.C.App. 3 §§ 4(a)(2)–(a)(5). Section 5 requires the IG to prepare reports regarding its activities, including its findings regarding fraud, abuse

---

**3.** As noted, the issue of burdensomeness was resolved when the IG made it clear that Rose could comply with the subpoena by providing a client list to the IG and no other documents. In a footnote in its Reply Memorandum, Rose once again argues that improper political pressure caused the IG to initiate the investigation. Rose has failed to present any additional facts that would convince the Court to change its earlier rejection of this argument.

and waste in programs of the agency. 5 U.S.C.App. 3 § 5.

It is obvious that the IG could not fulfill many of its responsibilities under sections 4(a)(2) through 4(a)(5) and section 5 of the Act, as well as under section 4(a)(1), without investigating fraud, abuse and waste by *both* the agency administering and financing the program *and* the participants in the program. The "relating to" language of Section 4(a)(1) is extremely broad, and it is given context by these other sections of the Act. The Court therefore finds that the investigatory authority granted by section 4(a)(1) necessarily extends to investigations of fraud, waste and abuse by government contractors and other recipients of government funds under or relating to programs of a Department or agency.

The legislative history of the Act also makes plain that Congress intended the IG's investigatory authority to extend to the investigation of recipients of government funding as well as to government agencies themselves. Congress enacted the Inspector General Act in part because of revelations of significant corruption and waste in the operations of the federal government and among government contractors, government grantees and other recipients of federal funds. S.Rep. No. 1071, 95th Cong., 2d Sess. 4 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2679, 2683. In justifying the need for subpoena power, the Senate Report stated that Inspectors General are to investigate both an agency's "internal operations and its federally-funded programs" and that the IG should identify "perpetrators of programmatic fraud." 1978 U.S.C.C.A.N. at 2702. The Senate Report also stated:

> Subpoena power is absolutely essential to the discharge of the Inspector and Auditor General's functions. There are literally thousands of institutions in the country which are somehow involved in the receipt of funds from Federal programs. Without the power necessary to conduct a comprehensive audit of these entities, the Inspector and Auditor General could have no serious impact on the way federal funds are expended....

> The committee does not believe that the Inspector and Auditor General will have to resort very often to the use of subpoenas. There are substantial incentives for institutions that are involved with the Federal Government to comply with requests by an Inspector and Auditor General. In any case, however, knowing that the Inspector and Auditor General has recourse to subpoena power should encourage prompt and thorough cooperation with his audits and investigations.

1978 U.S.C.C.A.N. at 2709. *See also United States v. Aero Mayflower Transit Co., Inc.,* 831 F.2d at 1145.

Representative Levitas, one of the co-sponsors of the Act, explained the IG's intended role:

> [T]he Offices of Inspector General would not be a new "layer of bureaucracy" to plague the public. They would deal exclusively with the internal operations of the departments and agencies. *Their public contact would only be for* the beneficial and needed purpose of receiving complaints about problems with agency administration and in *the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars.*

124 Cong.Rec. 10,405 (1978) (emphasis added). As the co-sponsor of the Act, Representative Levitas's remarks "are an authoritative guide to the statute's construction." *North Haven Board of Education v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982). Representative Levitas's statement and the Senate Report demonstrate that Congress understood the Act to give the Inspectors General the authority to investigate recipients of federal funds, such as government contractors, who may have misused or stolen the funds through fraud, abuse or waste.

■ Rose argues, however, that the IG's authority is not boundless and that it is expressly limited by sections 8G(b) and 9(a)(2) of the Inspector General Act. Both sections provide that in establishing an Office of Inspector General, the agency head may not transfer to the IG "any program operating responsibilities." 5 U.S.C.App. 3 §§ 8G(b), 9(a)(2). Just as the agency head

may not transfer such responsibilities to the IG, reciprocally, Respondent argues, the IG may not usurp the agency's program operating responsibilities. Rose asserts that one of the RTC's program operating responsibilities is determining whether its contractors have any conflicts of interest. Thus, the IG's investigation of whether Rose had any conflicts of interest is really an investigation of Rose's compliance with the RTC's regulations at 12 C.F.R. Part 1606, an investigation that is within the purview of the OCOS and consequently exceeds the IG's authority.

Petitioner responds that sections 8G(b) and 9(a)(2) do not limit the IG's authority established under the earlier sections of the Act. The IG maintains that these sections are directed at the agency heads who are given authority to transfer certain functions to the IG, but are expressly prohibited from transferring to the IG the responsibility for operating the programs entrusted to the agency. The sections do not impose a reciprocal limitation on the IG that circumscribes his authority to investigate fraud, abuse and waste in programs of the agency. Respondent's reading of the Act is strained and is inconsistent with the language, legislative history and overall scheme of the statute. The Court therefore agrees with Petitioner.

The Court is not persuaded to the contrary by the decision in *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d 631, 643 (5th Cir. 1993), on which Rose relies.[4] The court in *Burlington Northern* concluded that Congress intended that "Inspectors General should not be allowed to conduct 'program operating responsibilities' of an agency," that "the Inspector General has an oversight rather than a direct role in investigations conducted pursuant to regulatory statutes" and that "he may investigate the Department's conduct of regulatory investigations but may not conduct such investigations himself." *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d at 642, 643.

*Burlington Northern* imposed limits on the authority of Inspectors General that do not appear on the face of the statute or in its legislative history. In addition, it turns on a set of facts clearly distinguishable from the facts before the Court in this case. In *Burlington Northern,* the Railroad Retirement Board Inspector General investigated tax compliance by a regulated railroad that was *not* a recipient of federal funds. The IG's investigation was in no way related to its oversight responsibilities for a federal program. Furthermore, the IG in *Burlington Northern* was not investigating fraud, abuse or waste. The court noted that "[t]he Inspector General never suggested that he had any reason to suspect that Burlington Northern was engaged in fraudulent or abusive reporting," and thus upheld the district court's determination "that the detection of fraud and abuse in the RRB's programs would have only been a by-product of the proposed" regulatory audit. *Burlington Northern R.R. v. Office of Inspector General, Railroad Retirement Board,* 983 F.2d at 640.

By contrast, the IG's investigation into Rose's possible conflicts of interest directly concerns whether a government contractor receiving federal funds related to a federal program may have committed fraud or abuse or wasted taxpayer dollars by failing to disclose actual or potential conflicts. Any undisclosed Rose conflicts of interest could have denied the RTC the independent, loyal and diligent legal representation and advice for which taxpayer dollars were paid, which the IG might conclude constituted waste and abuse. Any miscertification of the nonexistence of conflicts could have constituted false statements and fraud.

The Inspector General's investigation into Rose's conflicts of interest does not exceed his statutory authority and does not usurp the program operating responsibilities of the RTC. As part of its mission to resolve failed thrift institutions, the RTC may investigate the possible conflicts of interest of its contractors. As part of its mission to root out

---

4. Rose also relies on *United States v. Montgomery County Crisis Center,* 676 F.Supp. 98 (D.Md. 1987), but that reliance is misplaced. In that case, the IG's subpoena was not in connection with an investigation of alleged fraud, inefficiency or waste, but of a security matter not involving the expenditure of federal funds relating to a program of the Department involved.

fraud, abuse and waste in RTC programs, the Inspector General may also investigate conflicts of interest of the RTC's contractors. In this situation, the RTC investigation and the IG investigation are not, and need not be, mutually exclusive. The failure to disclose a conflict of interest, if there was such a failure, may constitute not only a violation of the RTC's regulations, which the RTC through OCOS has authority to investigate, but also may constitute fraud, abuse or waste in federal programs by a recipient of federal funds which the IG has authority to investigate. Accordingly, the Court will enforce the subpoena.

### B. The IG's Revised Confidentiality Undertaking Makes It Unnecessary For The Court To Exercise Its Authority To Issue A Protective Order

To protect the confidentiality of the materials sought from the Rose Law Firm, the IG provided a Confidentiality Undertaking to Respondent on June 28, 1994. Following discussions between the parties, the IG provided a revised Confidentiality Undertaking on August 15, 1994. After the Court denied its Motion to Transfer, Respondent moved the Court to enter a Protective Order that would provide greater assurances of confidentiality.

Rose requested a protective order that would require the documents produced to be kept in a neutral location under the control of the Court, limit the number of persons in the IG's office who would be permitted access to the documents, require the IG to maintain a log of persons with access and when they had access to the documents, prohibit disclosure outside the IG's office of information derived from the documents, require the IG to give reasonable notice before disclosure of the documents to other agencies or the Congress, and require the return of the documents within 30 days after production. Rose argued that in the circumstances of this case the IG's August 15 Confidentiality Undertaking was insufficient to protect the client list from disclosure or leaks.

At the October 20 hearing, the Court expressed its concern about the privacy interests of Rose's clients who have no relation-

ship to this investigation. It suggested that those clients had a right to engage a law firm with the legitimate expectation that even the fact of that engagement would not become a matter of public knowledge in the course of a highly-publicized, politically-charged investigation relating to the law firm they had chosen. October 20, 1994, Hearing Transcript at 35–44, 50–51. The Court suggested that the parties attempt to negotiate further changes to the IG's August 15 Confidentiality Undertaking that might accommodate both parties, provide greater protection to Rose and its clients and respond to the concerns expressed by the Court. Transcript at 73. Despite their inability to reach agreement, on October 26, 1994, the Inspector General did offer an amended Confidentiality Undertaking that provided additional protections. Appendix B. The Court must decide whether those protections are sufficient and whether it has the authority to provide greater confidentiality protections.

 Petitioner argues that the Court may not substitute its judgment for the IG's regarding the level of confidentiality protections a subpoenaed party should receive. Rather, the IG asserts, once a court has determined that an agency's subpoena should be enforced, it may evaluate only the reasonableness of the way in which the agency has exercised its discretion regarding what confidentiality protections are necessary. *United States International Trade Comm. v. Tenneco West*, 822 F.2d 73, 76 (D.C.Cir.1987). Where an agency has promulgated a reasonable regulation governing the confidentiality of documents produced to the agency, the courts usually will defer to the agency's regulations or rules regarding the level of protection to be provided. *United States International Trade Comm. v. Tenneco West*, 822 F.2d at 79. The IG notes that even in the absence of formal regulation, courts usually will defer to reasonable written assurances of confidentiality like the Confidentiality Undertaking provided here. *Id.; FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d 966, 973–74 (D.C.Cir.1980).

 Notwithstanding the IG's assertions, the Court concludes that its authority is not so limited. "Since the enforcement of

a subpoena is an independent judicial action, and not merely an action ancillary to an earlier agency action, a court is free to change the terms of an agency subpoena as it sees fit." *United States v. Exxon Corp.*, 628 F.2d 70, 77 (D.C.Cir.), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980) (citations omitted). It therefore necessarily falls within the Court's discretion to provide additional confidentiality protections beyond those offered by the agency when it concludes that the agency, in the exercise of its discretion, has not provided safeguards sufficient to protect the interests of those at risk. *FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d at 974. Indeed, in appropriate circumstances, it may modify a subpoena it is asked to enforce to incorporate such confidentiality provisions. *United States v. Exxon Corp.*, 628 F.2d at 77.

▮ An agency invoking the aid of a court to enforce a subpoena may not tell a court it has no authority to condition or modify the subpoena to protect those whom enforcement of the subpoena may put at risk. After all, a court is not merely a "rubber-stamp" in subpoena enforcement proceedings. *FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d at 974. A court may place "[s]ome limits ... on an agency's use of *court* process, since ... it is the court's process that compels the respondent to comply with these administrative demands.... [W]here the processes of the Court are involved, there must be opportunity for the Court to satisfy itself that the agency's power will be properly used." *RTC v. KPMG Peat Marwick,* 779 F.Supp. 2, 3–4 (D.D.C. 1991). *See also SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1032–33 (D.C.Cir.1978), *cert. denied* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). "[A]gency determinations on confidentiality are not sacrosanct." *FTC v. Owens–Corning Fiberglas Corp.*, 626

F.2d at 980 (Wald, J., concurring in part and dissenting in part); *see id.* at 981–84. It is a legitimate exercise of the court's authority to modify the terms of an agency subpoena by providing additional confidentiality protections for a person or entity to whom the subpoena is directed, and particularly for innocent third parties about whom the respondent that is the subject of subpoena may possess information. *See United States v. Exxon Corp.*, 628 F.2d at 77.

▮ In the highly-charged political atmosphere surrounding the Whitewater investigations, Rose's submission of the client list to the IG creates the risk of public disclosure of the names of clients who have themselves done nothing wrong, whose engagement of the Rose Law Firm is wholly irrelevant to any legitimate conflict of interest investigation by the IG, and who had an expectation of privacy when they chose the law firm. The Court is concerned that the media and other interested individuals and organizations may seek to learn the names of Rose's clients in order to embarrass the firm or simply to see what prominent or newsworthy individuals or companies may have chosen Rose as their law firm at any time from 1985 to 1994. If the IG transfers the client lists to other entities within the RTC, to other Departments or agencies of government or to the Congress, the risk of advertent or inadvertent public disclosure increases. Indeed, as Respondent has pointed out, the RTC's Deputy CEO, John Ryan, testified before Congress that "the RTC does leak ... [i]t's almost a certainty around the RTC that any matter that has any kind of public interest at all is leaked to the press prematurely." Hearings on Whitewater Inquiry Before the Senate Committee on Banking, Housing and Urban Affairs, 33, 55 (August 1, 1994), Respondent's Exhibit D.[5]

---

5. Rose argues that Mr. Ryan did not exclude the IG's office from his testimony discussing the certainty of leaks at the RTC. The Office of the Inspector General is independent from the RTC, however, and the Confidentiality Undertaking offered by the IG provides a sufficient wall between the IG and other components of the RTC. The purpose of the Inspector General Act is to create independent and objective watchdogs of agencies. *See* 5 U.S.C.App. 3 § 2; S.Rep. No. 1071, 95th Cong., 2d Sess. (1978), *reprinted in*

1978 U.S.C.C.A.N. 2676, 2682. Accordingly, the Court will not treat Mr. Ryan's statements as extending to the IG's office. Furthermore, "allegations of the prevalence of 'leaks' ... notwithstanding," the Court will not presume that improper disclosure will occur in the absence of specific evidence of an "immediate threat of illegal disclosure." *Exxon Corp. v. FTC*, 589 F.2d 582, 591 (D.C.Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979).

As the IG acknowledged in open court, the vast majority of the clients on Rose's client list will not present potential or actual conflicts. When the IG compares the client list with the documents and records he has within his own files or has acquired from others during the course of his investigation, he is likely to uncover only a small subset of clients whose relationship with Rose warrants further investigation as to whether their representation by Rose may present a conflict of interest. The Court therefore finds that most of the names on the client list Rose is to provide to the IG pursuant to subpoena are irrelevant to the IG's investigation and that the IG himself will quickly see that major portions of the list are wholly irrelevant.

Public disclosure of names of clients irrelevant to the investigation would harm the Respondent in its business and in its relationship with its clients and could also harm the clients whose names are disclosed. The Court is concerned that clients who are not and never will be implicated in the IG's investigation will become subject to media and political speculation that intrudes on the client's legitimate expectation of privacy. But for the fact that there is no feasible way to separate relevant from irrelevant client names until after the IG has completed the preliminary phase of his investigation, the Court would be justified in refusing to enforce the subpoena at all as to client names that the RTC could not show are relevant. *See FTC v. Invention Submission Corp.,* 965 F.2d at 1089 (citation omitted); *FTC v. Anderson,* 631 F.2d 741, 746 (C.A.D.C.1979) (citation omitted). Because there is no practical way to provide that relief, however, the question is whether a protective order can achieve a comparable result.

The Confidentiality Undertaking now offered by the IG provides that the Office of Inspector General will not disclose the confidential documents of the Rose law firm or their contents except with certain protections. *See* Appendix B. First, the client list

will not be disclosed in response to a Freedom of Information Act request without the IG providing Rose ten days' prior notice. Confidentiality Undertaking ¶ 1.[6] Second, the IG will provide Rose ten days' prior notice *where possible,* or as much advance notice as can reasonably be given under the circumstances, before disclosing the client list or parts thereof in response to an official request from Congress. ¶ 2. Third, the IG will give Rose ten days' prior notice before disclosing the client list to other federal or state agencies, except that no notice will be provided to Rose for disclosures to the Department of Justice or the Independent Counsel investigating Whitewater. ¶ 3. The IG will inform any entity, either Congress or an agency to which the client list is disclosed, that the list is confidential. ¶¶ 2–3. Fourth, only those personnel within the OIG who need to use the Rose client list in the performance of their official duties may have access to the information. Those personnel also will be informed of the information's confidentiality. ¶ 4.

Nothing in the Confidentiality Undertaking, however, would prohibit the OIG's right to use, retain or bring to the attention of other components of the RTC, the Justice Department, the Independent Counsel, Congress or any other governmental agency, without notice to Rose, any client names or relevant portions of documents that the OIG concludes are "relevant to conflicts-of-interest issues, to violations of law, regulation or contract, to misrepresentations, or to any findings or recommendations the OIG intends to make." Confidentiality Undertaking ¶ 5. Finally, when the IG concludes that he no longer requires physical possession of the client list or after 180 days, whichever is the shorter period, the IG will submit all documents that Rose has produced and all client lists that the OIG has created to the Clerk of this Court to be held by the Court under seal. Thereafter, relevant personnel

---

**6.** This provision is typical of regulations promulgated by other Departments and agencies of the government, including the RTC, at least with respect to confidential commercial information, such as client lists, under exemption 4 of the FOIA. *See* 12 C.F.R. § 1615.6. The FOIA regulations governing the RTC Inspector General, however, have no such notice provision. *See* 12 C.F.R. Part 1680.

within the OIG will have access to the documents only at the courthouse. ¶ 6.

The IG's revised Confidentiality Undertaking provides significant protections beyond those offered in the August 15 Confidentiality Undertaking. It also goes a long way towards dealing with the concerns expressed by the Court at the October 20 hearing. With respect to almost all situations in which the lists, or portions of them, will be disclosed to others, and particularly with respect to Rose's clients who are wholly irrelevant to the IG's investigation and whose expectations of privacy deserve special protection, it provides Rose with notice sufficient to object and make its arguments before any disclosure. *See, e.g., FTC v. Texaco, Inc.,* 555 F.2d 862, 884–85 (D.C.Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). While the Confidentiality Undertaking does not limit the OIG's use, or the use by other enforcement agencies, of client names that the OIG in its discretion determines are relevant to its conflicts investigation or other violations of law, the Court concludes that this exclusion from the protections of the Confidentiality Undertaking is a legitimate exercise by the IG of his discretion consistent with his statutory responsibilities.

Despite its expressed concerns, the Court cannot devise any greater protections for those unimplicated clients of the Rose law firm, consistent with the IG's law enforcement and other statutory responsibilities, than those the IG himself has offered. A careful examination of the two proposals now made by Rose demonstrates that Rose, too, has been unable to develop additional workable protections for the privacy interests of the non-relevant clients. First, Rose maintains that the IG should not retain possession of the client list at all, in part because the IG intends to carry the list to various sites where failed thrift institutions are located, which Rose argues will increase the risk of leaks. Instead, Rose proposes that copies of the client list should reside only at the offices of the Rose Law Firm in Little Rock, Arkansas and in Washington, D.C. Second, and in the alternative, Rose argues that the Court should require the IG to return the client list to Rose at the completion of the initial phase of the IG's investigation, rather than have the IG file the list under seal with the Court. This procedure, Rose claims, would prevent the risk of disclosure from remaining open-ended beyond the time necessary for the RTC to conduct its comparison and would insulate the Court from media and other requests.

The Court rejects Respondent's request that the client list be retained at the offices of the Rose Law Firm rather than be turned over to the IG. Rose's request that the IG's access to the subpoenaed materials be limited to such locations would impermissibly interfere with the IG's discretion to conduct its investigation as he sees fit, without disclosing the scope of the investigation to those who may be affected. It would impose unnecessary practical impediments to the ability of the IG to work with the list. *See* Third Declaration of Assistant Inspector General Clark W. Blight ¶¶ 4–7; *FTC v. Texaco, Inc.,* 555 F.2d at 871, 883. Furthermore, Rose has not made a showing that the Inspector General will act "cavalierly or in bad faith" and thus has not overcome the presumption of administrative regularity and good faith that the Court is obliged to give to the IG. *See FTC v. Invention Submission Corp.,* 965 F.2d at 1091 (quoting *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d at 975).

The Court also rejects Respondent's request that the client list be returned to the Rose Law Firm at the end of the initial phase of the IG's investigation rather than being filed under seal with the Court. While the Court may have discretion to require the IG to return the client list to Rose, *United States v. Exxon Corp.,* 628 F.2d at 77; *SEC v. Arthur Young & Co.,* 584 F.2d at 1032–33, it is more appropriate to defer to the agency's discretion on this matter if it is being reasonably exercised in the circumstances. The Court will not impose Rose's requested requirement on the IG over his objection because to do so would not alleviate the Court's primary concern in this case: that the privacy and confidentiality interests of the clients who are not relevant to the investigation be protected. Requiring the IG to return all documents and all client lists to Rose would not afford these clients any

greater protection than will be furnished by having this information filed under seal with the Court.

The IG has acted in good faith in addressing the concerns the Court raised at the October 20 hearing. His new Confidentiality Undertaking incorporates many of the additional protections for Rose and its clients that the Court had indicated were reasonable and appropriate. The IG's considered judgment and reasonable exercise of his discretion strengthens his argument that his judgment deserves deference from the Court. Accordingly, the Court concludes that the IG has exercised his discretion within permissible limits and defers to his judgment. *See FCC v. Schreiber,* 381 U.S. 279, 291, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965); *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d at 974.

The Court does, however, remain concerned about the possibility of leaks and about the possible disclosure of the identities of clients of the Rose Law Firm who have no relationship to the IG's investigation. The notice provisions of the IG's October 26 Confidentiality Undertaking provide a mechanism for Rose to object to disclosure and to attempt to protect that information under relevant exceptions to the Freedom of Information Act and recognized state and federal privileges. If these procedures prove unworkable or unsatisfactory or if unauthorized disclosures or leaks do take place, or if Rose has reason to believe they are about to take place, the Court remains ready on short notice to deal with such concerns. It will make itself available to address these matters on an expedited basis and is prepared to deal appropriately with those who violate the Confidentiality Undertaking, the Orders of this Court or the rights of Rose or its clients.

### III. CONCLUSION

The Court finds that Respondent has failed to carry its burden of proving that the subpoena exceeds the statutory authority of the Inspector General. The Court also concludes that, in view of the substantial additional protections the Inspector General provided in his October 26, 1994 Confidentiality Undertaking, Respondent has failed to supply a sufficient basis for the Court to enter an order requiring, *inter alia,* that the client list remain in the possession of the Rose Law Firm or, alternatively, that it be returned to Rose rather than filed under seal with the Court.

For the foregoing reasons, it is hereby

ORDERED that the Petition of the Inspector General of the Resolution Trust Corporation For Summary Enforcement Of Administrative Subpoena Duces Tecum is GRANTED; it is

FURTHER ORDERED that the Rose Law Firm, A Professional Association, shall commence its compliance with the terms of the Memorandum of Understanding entered into on October 7, 1994, attached as Appendix A, within fifteen (15) days of the date of this Order and proceed to produce the subpoenaed information in accordance with the schedule agreed to in Paragraph II.F. of the Memorandum of Understanding; it is

FURTHER ORDERED that the Respondent's Motion for Protective Order is DENIED; and it is

FURTHER ORDERED that the Inspector General, the Office of Inspector General and its employees, and all other agencies of government and government employees to whom Rose Law Firm documents are provided pursuant to the Memorandum of Understanding or the Confidentiality Undertaking shall comply with the terms of the Confidentiality Undertaking provided by the RTC on October 26, 1994, attached as Appendix B.

SO ORDERED.

### APPENDIX A

*MEMORANDUM OF UNDERSTANDING*

This Memorandum of Understanding is entered into this 7th day of October, 1994, between the Office of Inspector General, Resolution Trust Corporation ("OIG") and Rose Law Firm, P.A., ("RLF") with respect to the Inspector General subpoena dated April 18, 1994 issued to RLF ("the subpoena") and the subpoena enforcement action *John J. Adair, Inspector General of the Resolution Trust Corporation v. Rose Law*

*Firm, A Professional Association,* Misc. No. 94–278 (PLF), which is pending in the United States District Court for the District of Columbia ("*Adair v. RLF* ").

### I. *RLF Representations*

RLF represents that it does not have, in either hard copy or computer medium, a list containing all the client identities demanded by the subpoena. Further, RLF represents that it does not maintain any other centralized system(s) containing client identities that could be searched to produce a more comprehensive list of clients during the period January 1, 1985 through April 15, 1994, than the aggregate of client identities covered under Section II below.

### II. *Production Constituting Compliance With Subpoena*

RLF represents that it has the following systems containing client identities covered by the subpoena and RLF agrees that, if the district court in *Adair v. RLF* orders enforcement of the subpoena, RLF will produce the following information, and OIG agrees that production of the following information will constitute full and complete compliance with the subpoena:

A. RLF maintains hard copy monthly fee credit reports, generated over time by its accounting system, for each calendar month from January 1985 through April 1994, which reports list all RLF clients that paid fees to the firm during the prior month. RLF will produce copies of all these reports, redacted to show only the title and date of the report and the names of all clients included in the report.

B. RLF's accounting system generates each month a hard copy alphabetical list which includes all active clients ("alpha list"). From time to time clients for which RLF no longer actively provides legal services are purged from the system and thus are not included in succeeding alpha lists. RLF routinely discards prior alpha lists when the following month's alpha list is produced. To the best of its knowledge, the earliest alpha list that RLF currently possesses is the al-pha list dated August 5, 1994. RLF will produce that alpha list, redacted to show only the title and date of the list and the names of all clients contained in that alpha list.

C. As part of its system for checking conflicts, beginning in 1987 RLF created a computer data base that included its then-active clients, and thereafter it added all new clients to that computer data base through some time in 1992, after which no new clients were added to the data base ("Wang/TextWare Data Base"). RLF will print out a list of all clients names contained in the Wang/TextWare Data Base and produce this list. If it can reasonably be done, RLF will also provide the same names on a computer tape in a form useable by the OIG, and the OIG will reimburse RLF for the reasonable cost of producing the tape.

D. When RLF discontinued entering new client names into the Wang/TextWare Data Base in 1992, it relied on identification of all new clients in Weekly Summaries, hard copies of which it has retained. RLF will produce copies of the Weekly Summaries for January 1, 1992 through April 15, 1994, redacted to show only the title and date of the summary and the names of all clients included in the summary.

E. To cover the period before the initiation of the Wang/TextWare Data Base, RLF will produce the following documents to the extent that it has them in its possession or control: (a) for January 1, 1986 through December 31, 1987, copies of Weekly Summaries redacted to show only the title and date of the summary and the names of all clients included in the summary; and (b) for April 25, 1985 (before which date RLF represents that it does not have such documents) through December 31, 1985, copies from microfilm of Daily Briefs redacted to show only the title and date of the Daily Brief and the names of all clients included in the Daily Brief. The OIG will reimburse RLF for the reasonable cost of retrieving and producing these copies.

F. RLF will produce the documents as necessary redactions are completed, but not later than the following number of days after issuance of an order of the district court enforcing the subpoena, unless that order is

stayed by that court or by the United States Court of Appeals for the District of Columbia Circuit, in which case the time would begin to run if and when such stay is dissolved: RLF will produce the alpha list specified under paragraph B within 15 days; RLF will produce the information specified under paragraphs C and D on a rolling basis, with completion of such production within 30 days; and RLF will produce the documents specified under paragraphs A and E within 45 days.

G. When RLF's production of the documents and information described above to the OIG is complete, RLF will so certify in the form provided in Section III below.

RLF hereby makes the representations and agreements contained in Sections I and II above.

/s/ Ronald M. Clark
Ronald M. Clark
Chief Operating Officer
Rose Law Firm, P.A.

OIG hereby agrees that production of the documents and information described in Section II will constitute full and complete compliance with the subpoena and that it will reimburse RLF as specified in paragraphs II.C and II.E.

/s/ Patricia M. Black
Patricia M. Black
Counsel to the Inspector General of the Resolution Trust Corporation

## III. *RLF Certification*

I hereby certify that RLF has produced to the OIG a complete set of all of the documents described in Sections II.A, B, C, D and E above to the extent that they are in RLF's possession or control, disclosing all client names contained therein, with no redactions of client names.

/s/ Ronald M. Clark
Ronald M. Clark
Chief Operating Officer
Rose Law Firm, P.A.

Date: _____, 1994

## APPENDIX B

### OFFICE OF INSPECTOR GENERAL

### RESOLUTION TRUST CORPORATION

### *CONFIDENTIALITY UNDERTAKING*
### *BY*

### *THE INSPECTOR GENERAL OF THE*
### *RESOLUTION TRUST CORPORATION*

### *WITH RESPECT TO THE*
### *ROSE LAW FIRM*

In connection with the April 18, 1994 subpoena issued by the Inspector General, Resolution Trust Corporation to the Rose Law Firm, P.A. ("Rose") and the October 7, 1994 Memorandum of Understanding between the Office of Inspector General ("OIG") and Rose regarding what documents would constitute full and complete compliance with that subpoena ("MOU"), I am issuing this Confidentiality Undertaking to Rose. Prior to Rose's producing such documents to the OIG, Rose may designate such documents as confidential by stamping each page "CONFIDENTIAL". I have determined that the OIG will not disclose these documents or their contents except pursuant to the following provisions and that the following provisions will protect the confidentiality of such documents and their contents:

(1) The OIG acknowledges that these documents, which reveal the identity of Rose's clients, constitute "confidential commercial information" within the meaning of Executive Order 12600, and will not be disclosed pursuant to a FOIA request without giving Rose ten days prior notice and complying with the other procedures specified in that Executive Order. Any request that does not meet the requirements of paragraphs 2 and 3 below will be treated as a FOIA request.

(2) In response to any official request from Congress, either House thereof, or a Congressional Committee or Subcommittee acting pursuant to Committee business, the OIG may disclose the documents to the requesting entity, but will not do so without (a) giving Rose ten days prior notice where possible, and in any event, as much advance notice as can reasonably be given under the circum-

stances, before releasing or granting access to the documents, and (b) informing the requesting entity that the documents should be considered confidential.

(3) In response to any request from another federal agency (including other components of the RTC) or a state agency, the OIG may disclose the documents to the requesting entity as follows:

(A) In response to a request from the Department of Justice or the Independent Counsel, the OIG may disclose the documents to the requesting agency or instrumentality and, if it does so, will inform the requesting entity that the documents should be considered confidential;

(B) In response to any request not within subparagraph (A) above, the OIG may disclose the documents to the requesting entity, but will not do so without (1) giving Rose ten days prior notice, and (2) informing the requesting entity that the documents should be considered confidential.

(4) Nothing herein shall limit the OIG's internal use of the documents or information contained therein, such use to be determined solely by the OIG. However, within the OIG, Rose's client list and the identities of individual clients will be kept confidential and will be shared internally only with those OIG employees and counsel who have a need for such documents or information in the performance of their duties. Such employees and counsel shall be apprised of this confidentiality undertaking and the need to maintain the confidentiality of such documents and information.

(5) Nothing herein shall limit the OIG's right to use, to retain or to bring to the attention of other components of the RTC, the Department of Justice, the Independent Counsel, Congress, or any other government agency or instrumentality, without notice to Rose, any client names or relevant portions of particular documents which names or portions of documents the OIG concludes are relevant to conflicts-of-interest issues, to violations of law, regulation or contract, to misrepresentations, or to any findings or recommendations the OIG intends to make.

(6) When the Inspector General determines that the OIG no longer needs to have physical possession of the documents in order to continue his investigation, but in any event no later than 180 days following the OIG's receipt of all the documents and the certification called for by the MOU, the OIG will submit (a) all the documents produced by Rose, and (b) all lists of Rose clients created by OIG from the documents produced by Rose, to the Office of the Clerk of the United States District Court for the District of Columbia ("Clerk") to be held by the Clerk under seal pursuant to court order in *John J. Adair, Inspector General of the Resolution Trust Corporation v. Rose Law Firm, A Professional Association,* Misc. No. 94–278, pending in that Court, provided, however, that:

(A) The OIG will retain possession of the names and documents described in paragraph 5 above;

(B) The OIG will be entitled to review within the Courthouse upon request to the Clerk, but not to remove from the Courthouse, the documents held under seal by the Clerk at any reasonable time and as often as it wishes, and shall have the right to take possession of and retain any individual client names and/or documents that the OIG determines fall within the scope of paragraph 5 above but which the OIG theretofore had not retained under said paragraph 5, all without notice to Rose and without the need for approval by the Court;

(C) If any request for documents pursuant to paragraphs 2 and 3 is pending at the time the OIG is to deliver the documents to the Clerk (*e.g.,* because of a notice period, stay or timing of receipt of the request), the OIG will process such request pursuant to the provisions of said paragraphs and will delay delivering the documents to the Clerk until it completes processing such request; and

(D) When the Inspector General determines that there is no further need for the documents to be retained, he shall so notify the Clerk and Rose. The Clerk shall then destroy the documents.

/s/ John J. Adair
JOHN J. ADAIR
Inspector General
Resolution Trust Corporation

October 26, 1994