**UNITED STATES of America and John Adair, Inspector General of the Resolution Trust Corporation, Petitioners,**

v.

**HUNTON & WILLIAMS, Respondent.**

Misc. Action No. 95–459 (RMU).

United States District Court, District of Columbia.

Jan. 3, 1997.

Inspector General of the Resolution Trust Corporation's (OIG–RTC) motion to enforce a subpoena *duces tecum*.[1] The RTC retained Hunton & Williams (H & W), a private law firm, to provide it with legal services on a number of matters relating to the management of several failed savings and loans (S & L) institutions. The subpoena seeks the production of information pertaining to conflict of interest searches conducted by H & W including, *inter alia,* a a client list for all H & W attorneys who performed RTC–related work, or in the alternative, the timesheets, with client names redacted, relating to the 40 invoices H & W submitted to the RTC as part of the OIG–RTC's audit, prior to H & W accepting to represent the RTC on a number of matters.

After having considering the parties' submissions and the relevant law, the court concludes that the subpoena, as narrowed, shall be enforced. Specifically, the court concludes that: the OIG–RTC had the authority to issue the subpoena; the information sought by the subpoena is reasonably relevant to the Inspector General's audit of H & W; and finally, that compliance with the subpoena is not unduly burdensome to H & W. Nevertheless, H & W has raised legitimate privacy and confidentiality concerns with respect to the representation of its clients. The parties shall therefore enter into a confidentiality agreement.

Eric S. Angel, U.S. Department of Justice, Civil Division, Washington, DC, for petitioners.

Stephen L. Braga, Miller, Cassidy, Larroca & Lewin, Washington, DC, for respondent.

**MEMORANDUM OPINION AND ORDER**

**Granting Petitioners' Motion to Enforce the Subpoena Duces Tecum and Ordering the Parties to Enter Into a Confidentiality Agreement**

URBINA, District Judge.

### I. Introduction

This matter comes before the court upon the United States' and the Office of the

### II. Background

Petitioners are the United States of America and the OIG–RTC. Congress created the RTC in response to the S & L crisis of the 1980's. The RTC is the product of the Financial Institutions Reform and Recovery Act of 1989 (FIRREA), Pub.L. 101–73, 103–Stat.1983, which is an amendment to the Federal Home Loan Bank Act (FHLBA). The primary mission of the RTC was to manage and resolve the financial problems of the failed S & L institutions for which conservators or receivers had been appointed beginning January 1, 1989. FIRREA,

---

1. Since the RTC and the FDIC merged in 1995, the Office of the Inspector General of the Federal Deposit Insurance Corporation (OIG–FDIC) joins the OIG–RTC in filing this motion.

§ 501(a), Pub.L. 101–73, 103 Stat. 183, 369 (codified as 12 U.S.C. § 1441a(b)(3)(A)(1) (Supp. V 1993)).[2] Pursuant to the Inspector General Act of 1978, Congress established the OIG–RTC as part of the RTC's administrative structure. 5 U.S.C.App. 3 §§ 11(1) and (2) (Supp.V.1993). On December 31, 1995, the RTC's term expired and the majority of its assets, personnel and operations, including those of the OIG–RTC, were transferred to the Federal Deposit Insurance Corporation (FDIC).

The Respondent, H & W, is a private law partnership based in Richmond, Virginia, with a Washington, D.C. office located at 2000 Pennsylvania Avenue, N.W., 9th Floor, Washington, D.C. H & W provided a variety of legal services to the RTC from 1990 to 1995.

### A. The OIG–RTC's Audit of Hunton & Williams

Under FIRREA, the RTC was authorized to hire outside contractors, such as private law firms, to assist it in carrying out its duties. 12 U.S.C. § 1441a(b)(11)(A). Beginning in 1990, the RTC retained H & W to provide it with legal services on a number of matters relating to the management of several failed S & L institutions. As of July 1995, H & W has been paid over $2.9 million for such services.[3]

On March 7, 1994, H & W was informed, by letter, that it had been selected for an audit by the OIG–RTC to determine whether the services it rendered to the RTC between 1991 and 1993 and the costs it charged to the RTC and the FDIC with respect to those services were "reasonable, adequately supported, and within the terms of applicable policies, regulations and agreements."[4]

The audit was initiated in accordance with a program established by the OIG to review all legal fees and expenses billed to the RTC by outside law firms in order to prevent fraud and abuse. *Id.*[5] A central component of the program is for the RTC to review each firm's conflict of interest policies and the application of such policies to the representation of the RTC.[6] The OIG must determine whether: (a) the firm maintained and operated a system to identify actual or potential conflicts of interest; (b) the firm informed the RTC (or the FDIC) of any actual or

2. The RTC was created in part to act as a successor to the Federal Savings and Loan Insurance Corporation as a conservator or receiver for such thrift institutions. FIRREA, § 1441a(b)(11)(A). Pursuant to the Resolution Trust Completion Act, the assets, personnel and operations of the RTC (including those of the Office of the Inspector General of the RTC) were transferred to the FDIC. *See* Pub.L. 103–204 107 Stat. 2382, codified at statutory note to 12 U.S.C.A. § 1441a at 235–36. Thus, the FDIC now acts as a conservator or receiver for any remaining S & L entities that underwent financial crisis. *See also* discussion regarding the merger of the RTC and the FDIC, § II(A)(2)(b), *infra.*

3. Declaration of Sharon Vander Vennnet, Assistant Inspector General of Audit for the RTC, attached to Pet.Mem. as Exhibit B (Vander Vennet Decl.).

4. Among the "applicable policies and regulations" in question is the requirement that any outside law firm disclose to the RTC and the FDIC (and to certify that it has disclosed) all or potential conflicts of interest.

5. The potential for fraud and abuse is great, given that the amount of outside legal work performed and the concomitant taxpayer dollars paid for such services is considerable. The RTC law firm audit program, was indeed "deemed necessary by the [O]IG because of the RTC's extensive reliance on outside counsel to assist it in performing its statutory duty to manage and resolve troubled savings and loans, and the fact that by the end of this year [1995] the RTC will have spent *over $1.54 billion on legal services.*" Vander Vennet Decl. at 2 (emphasis added).

6. "In addition to actual or potential conflicts covered by the Code of Professional Responsibility, Model Rules or other applicable federal state provisions, there are other actual or potential conflicts situations particular to a law firm's representation of the RTC or FDIC which a law firm is obligated to disclose to them. These include, but are not limited to, such matters as participation of any member or associate of the firm as a director or officer of any insured institution that has failed or that is the subject of any ongoing supervisory action; representation of an officer, director, debtor, creditor or stockholder of any failed or assisted institution in a matter related to the FDIC or RTC; representation of a creditor whose claim competes with that of the FDIC or RTC; the existence of any outstanding loans from a failed institution on which any member or associate of the firm is a borrower or guarantor; and representation of a client in a matter adverse to the FDIC or RTC." *RTC Guide for Outside Counsel,* February 1992, attached to Opp.Mem. as Exhibit E.

potential conflict; (c) the firm obtained a waiver from the RTC or the FDIC regarding any conflict or whether it withdrew its representation of the client causing the conflict; and finally, (d) the firm obtained a conditional waiver and complied with the conditions of the conditional waiver. *Id.*

In May 1994, the H & W partner in charge of RTC matters, Mr. Jack Molenkamp, met with independent auditors under contract with the OIG–RTC and their sub-contract attorney, Mr. Greg Garvin. During this meeting, Mr. Molenkamp provided Mr. Garvin with copies of the firm's conflict policy and conflict forms as well as other information regarding the conflict surveys that were performed in 1991.

In June of 1994, Mr. Garvin asked to review the original source material that supported the conflict reports, including copies of the attorney responses to the firm survey data and the data from the computer conflicts search. *Id.*[7] Although Mr. Molenkamp allowed Mr. Garvin to interview the paralegal responsible for conflicts searches, Ms. Judy Bugay, he refused to provide him with the original source material on the grounds that it contained confidential information about the firm's clients and other individuals with whom the firm had "confidential relationships." *Id.* at 7.

Subsequently, Mr. Ben Bornstein, of the OIG–RTC, personally contacted Mr. Molenkamp and requested a complete list of H & W clients, as well as all of the original source material for the 1991 and 1993 conflict checks. *Id.* Mr. Molenkamp again refused to provide the requested information without first obtaining client consent because it was his belief that such consent was mandated by Virginia ethical rules. *Id.*[8]

In October 1994, Mr. Garvin additionally requested to review random conflicts searches performed by H & W in relation to non-RTC cases, as opposed to only those related to RTC conflicts. *Id.* at 8. Mr. Molenkamp subsequently pulled several random files, but refused to allow the RTC to perform the random selection of conflicts memoranda itself. The firm also continued to refuse to disclose its client list. By way of a letter dated October 21, 1995, Mr. Molenkamp again advised Mr. Garvin that H & W was unable to comply with the RTC request because the firm was bound by Virginia Disciplinary Rule DR 4–101 which requires lawyers to protect "the confidences and secrets" of clients and a number of Legal Ethics Opinions by the Virginia State Bar that interpret the rule to include the protection of client identity. *Id.*

### B. The Subpoena Duces Tecum

Over the next several months the parties attempted to compromise on the level of disclosure, but negotiations ultimately resulted in an impasse. As a result, on November 9, 1996, the OIG–RTC issued a subpoena *duces tecum* to H & W, requiring the production of:

1. A list of all clients for the law firm of H & W (covering the period December 1, 1990–December 31, 1993)

2. The June 1991 and June 1993 conflicts questionnaires issued to H & W attorneys and the attorney's responses, including draft responses produced by the attorneys and any other firm or contract personnel, issued in connection with RTC and FDIC work performed; and

3. H & W's conflicts memoranda and conflicts alert materials for the following RTC matters:

 (a) LDID# 920065087: Chapter 11 Bankruptcy of Great Lakes

 (b) LDID# 920009454: Country Club Square Limited Partnership

 (c) LDID# 920013911: Richard and Brenda Knopp Matter;

 (d) LDID# 920009255: Loan Default by John F. McMahon, Jr.;

 (e) LDID# 920034867: NCR Corporation—Litigation (Disaffirmance)

---

**7.** "Original source material" is the actual conflicts questionnaire forms and responses by the attorneys, as opposed to summaries of such information (the conflict reports) prepared by the firm.

**8.** H & W found that many of the affected clients (i.e., those identified in the RTC conflicts source material) it contacted were unwilling to consent to having their identity revealed. Opp.Mem. at 8.

(f) LDID# 920058486: Edward J. Sarrazin—Foreclosure.[9]

H & W responded by offering to provide all of the information requested except for a complete client list (item no. 1). H & W reiterated its position that it could not ethically reveal the names of all of its clients. The OIG–RTC responded by advising H & W that a subpoena *duces tecum* would be issued requiring the production of the documents.

On December 29, 1995, the OIG–RTC filed the Petition for Summary Enforcement of Administrative Subpoena *Duces Tecum*. Subsequently, the OIG–RTC voluntarily narrowed the subpoena.[10] Paragraph 1 of the subpoena now requires H & W to produce all attorney timesheets to support the 40 invoices submitted by H & W to the RTC as part of the audit *or,* in the alternative, a client list for those H & W attorneys who were handling RTC/FDIC matters during the period December 1, 1990 through December 31, 1993 (instead of a complete firm client list, as previously requested). *Id.* The narrowed subpoena allows H & W to redact from the timesheets all information concerning any activities and services rendered to non-RTC/FDIC clients. The timesheets, however, must reveal the identities of these non-RTC/FDIC clients and the time charged to these clients. *Id.* Paragraph 2 has now been modified to require all information which the firm has located pertaining to the June 1993 conflicts questionnaire and responses thereto. Paragraph 2 also requires H & W to submit an affidavit detailing their efforts to find any of the documents requested. *Id.* Paragraph 3 of the subpoena remains unchanged. *Id.* H & W, however, continues to object to the subpoena because it still requires H & W to disclose the identities of clients not related to RTC matters. *Id.* at 11.

## II. Discussion

### A. Summary Enforcement of an Administrative Subpoena

It is well established that a court is compelled to enforce an administrative subpoena, if the court concludes that: (1) the subpoena was issued for a lawful purpose within the statutory authority of the agency that issued it; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome. *RTC v. Walde,* 18 F.3d 943, 946 (D.C.Cir.1994); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,* 5 F.3d 1508, 1513 (D.C.Cir.1993); *United States v. Aero Mayflower Transit Co.,* 831 F.2d 1142 (D.C.Cir.1987); *FTC v. Invention Submission Corp.,* 965 F.2d 1086, 1089 (D.C.Cir. 1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); *RTC v. Thornton,* 41 F.3d 1539, 1544 (D.C.Cir.1994); *accord United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368–69, 94 L.Ed. 401 (1950).

The subpoena meets all three of these requirements. In addition, while H & W raises legitimate concerns regarding the preservation of attorney-client confidences, its contention that the information sought by the RTC is protected from the administrative subpoena under Virginia Disciplinary Rule DR–4–101 and by a number of Virginia State Bar Opinions is without merit.

### 1. Lawful Purpose

The question of whether the subpoena was issued for a lawful purpose turns on whether the OIG–RTC possessed the requisite statutory authority to issue it in the first place. H & W argues that the OIG–RTC did not have the statutory authority to investigate H & W as outside contractors. In the alternative, H & W posits that because the RTC terminated on December 31, 1995, the subpoena is no longer valid. Both arguments fail. First, the statutory law, legislative history and case law clearly establish that the OIG has the authority to audit and investigate outside contractors in order to detect fraud and/or abuse. Second, the legislative history demonstrates that the merger effected between the RTC and FDIC by the RTC–Completion Act of 1993 included the transfer of the OIG–RTC's programs and operations

---

**9.** *See* Subpoena and Attachment A to RTC–OIG subpoena, attached to Pet. Brief as Exhibit C.

**10.** *See* Pet.Mem. ¶ 16 and attachment A thereto.

to the OIG–FDIC. The issuance of the subpoena is therefore valid.

### a. Legal Authority to Issue the Subpoena

■ The statutory law, legislative history and case law support the OIG–RTC's authority to investigate outside contractors for the purpose of detecting and preventing fraud by outside legal contractors. Under the Inspector General Act, the OIG of any given agency is charged with the responsibility of:

> [c]onduct[ing], supervis[ing] or coordinating audits and investigations relating to the programs of such establishment [ ] for the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in [such] programs and operations.

5 U.S.C.A.App. 3 § 4(a)(1)–(3). In other words, the Act provides a vehicle for the OIG to address the misuse of time, information and money in government agency activities. In order to accomplish this mission, Congress granted the OIG broad investigative powers, including the authority "to make such investigations [ ] as are in the judgment of the Inspector General, necessary or desirable" in carrying out his duties. *Id.* at § 6(a)(2). Congress specifically provided the OIG with the authority:

> To require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act[.]

5 U.S.C.A.App. 3 § 6(a)(4). Under the Act, the head of the agency in question (in this case, the RTC/FDIC) may not prevent or prohibit the OIG from "initiating, carrying out, or completing any audit or investigation." *Id.* at § 3(a). The OIC may therefore investigate "both an agency's internal operations and its federally funded programs" and to identify "perpetrators of programmatic fraud." 1978 U.S.C.C.A.N. at 2702.

■ There is no explicit limit on the OIG's authority to conduct such investigations anywhere in the Inspector General Act. The OIG may initiate an audit or investigation of a federal recipient without particularized suspicion since "[a]n administrative agency ... can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43, 70 S.Ct. at 364.[11] Moreover, the legislative history of the Act clearly indicates that Congress specifically intended to extend the OIG's power of review over private entities working closely with government agencies because such entities are privy to highly confidential information and are paid large sums of federal funds for their services, creating a potential risk for abuse both inside and outside government agencies. *See Adair v. Rose Law Firm*, 867 F.Supp. 1111, 1115 (D.D.C.1994).

In a House Report, Congress made it clear that Inspectors General "would have direct responsibility for conducting audits and investigations relating to [ ] the prevention and detection of fraud and abuse [in order] to determine financial integrity and compliance with pertinent laws and regulations." H.R.Rep. 584, 95th Cong., 1st Sess. at 11, 12 (1977). In a 1994 Senate report, Congress explicitly stated that the OIG–RTC was to "conduct [ ] audits and investigations of RTC operations *and contractors* in order to detect fraud, waste, and mismanagement in the disposition of insolvent S & L institutions and their assets by the RTC." S.Rep. No. 311, 103rd Cong., 2nd Sess. (1994) (emphasis added).[12]

---

**11.** *See also FTC v. Texaco, Inc.,* 555 F.2d 862 (D.C.Cir.) (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2939, 2940, 53 L.Ed.2d 1072 (1977).

**12.** Hunton & Williams' reliance on the remarks of Congressman Levitas, who was one of the co-sponsors of the Act, is unavailing. Specifically, H & W points to Congressman Levitas' statement that "the offices of the Inspector General would not be a new layer of bureaucracy." Opp.Mem. at 22 n. 20, (citing 124 Cong.Rec H 2950 (daily ed. Apr. 18, 1978)). Congressman Levitas, however, also states that while "[t]he Inspector General would be responsible for audits and investigations only," its "public contact" would include the "investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars." *Id.* "[T]hose persons" clearly include any recipient of federal funds that is in a position to cause such abuse, including outside contractors. Congressman Levitas' statement thus supports the conclusion that "Congress understood

Another Senate report speaks of the need for the OIG to address the extensive corruption and waste in the operations of the federal government and among recipients of federal funds. In explaining the need for subsection 4(a)(3), which gives the Inspector General the "duty and responsibility to conduct [ ] other activities [ ] for the purpose of preventing and detecting fraud and abuse in [the agency's] programs and operations," the report states that:

> [W]ithout such a provision, the legislation could be read to suggest the [OIG] was simply responsible for coordinating and supervising audits and investigations. However, the Committee intends that the [OIG] will assume a leadership role in any and all activities which he deems useful in order to [ ] prevent and detect fraud, waste and abuse in [the agency's] programs and operations.

S.Rep No. 1071, 95th Cong., 2d Sess. at 4 (1978), reprinted in 1978 U.S.C.C.A.N. 2676, 2702. Discussing the OIG's need for broad subpoena powers, the report further notes:

> Subpoena power is absolutely essential to the discharge of the Inspector [ ] General's functions. There are literally thousands of institutions in the country which are somehow involved in the receipt of funds from Federal programs. Without the power necessary to conduct a comprehensive audit of these entities, the Inspector and Auditor General could have no serious impact on the way federal funds are expended[.]

*Id.* at 2709. Citing this report, Judge Paul Friedman found that,

> the Act [ ] makes plain that Congress intended the Inspector General's investigatory authority to extend to the investigation of recipients of government funding as to government agencies themselves. Congress enacted the Inspector General Act in part because of revelations of significant

the Act to give the Inspector General the authority to investigate the recipients of federal funds[.]" *Adair*, 867 F.Supp. at 1116.

**13.** 5 U.S.C.App. § 9(a)(2). This section provides, in pertinent part:
 [S]uch other offices or agencies or functions, powers, or duties as the head of the establish-

corruption and waste in the operations of the federal government *and among government contractors*, government grantees, and other recipients of federal funds. *Adair*, 867 F.Supp. at 1116 (internal citations omitted). The court therefore concludes that the H & W audit and subpoena fall within the OIG–RTC's authority.

H & W additionally argues that the audit of H & W as an outside contractor does not fall within the OIG's authority because such an investigation constitutes a "program operating responsibility" and under § 9(a)(2) of the Inspector General Act an agency head may not transfer "program operating responsibilities" to the OIG. *See* 5 U.S.C.A.App. 3 § 9(a)(2).[13] Program operating responsibilities may be defined as those activities which are central to an agency's statutory mission versus those which are purely internal or administrative. In support of this argument, H & W primarily relies on *Burlington Northern R.R. Co. v. Office of the Inspector General*, 983 F.2d 631 (5th Cir.1993).

*Burlington Northern* involved an attempt by the OIG of the Railroad Retirement Board (OIG–RRB) to investigate tax compliance by a regulated railroad that was not a recipient of federal funds. Specifically, the OIG–RRB attempted to enforce a subpoena seeking information regarding tax contributions and compensation reported under the Railroad Unemployment Insurance Act and the Railroad Retirement Act in order to ensure the respondent's compliance with those acts, a task which the court concluded was the direct responsibility of the RRB. *Burlington Northern*, 983 F.2d at 636. The court concluded that "when a regulatory statute makes a federal agency responsible for ensuring compliance with its provisions, [the OIG] will lack the authority to make investigations or conduct audits which are designed to carry out that function directly." *Id.* at 642. The *Burlington* court, however, empha-

ment involved may determine are properly related to the functions of the Office and would, if so transferred, further the purposes of the Act, except that there shall not be transferred to an Inspector General, under paragraph (2) program operating responsibilities.

sized the "limited nature of [its] decision." *Burlington Northern*, 983 F.2d at 642.[14]

H & W's reliance on *Burlington Northern* is misplaced for several reasons. As an initial matter, the facts of *Burlington Northern* are distinguishable from those of this case. This case involves the auditing by the OIG of a recipient of federal funds. The OIG is reviewing H & W's representations vis-a-vis any professional conflicts of interest it may have had relating to its representation of the agency. The audit also involves the oversight of RTC/FDIC personnel in carrying out the investigation.[15] In addition, in this case, the OIG–RTC's audit was specifically and narrowly tailored to detect or prevent fraud or abuse among outside law firms such as H & W. Conversely, the OIG investigation in *Burlington Northern* was in no way related to oversight responsibilities for a federal program, nor was the OIG–RRB investigating fraud, abuse or waste of federal funds.[16] Finally, as this court has previously concluded, "*Burlington Northern* imposed limits on the authority of Inspectors General that do not appear on the face of the [Inspector General Act] or in its legislative history." *Adair*, 867 F.Supp. at 1117.[17]

On this matter, *Adair v. Rose Law Firm* is instructive. As in this case, *Adair* involved a subpoena *duces tecum* that was issued to a private firm (the Rose Law Firm) by the OIG–RTC requiring the production of a client list in connection with an audit. The audit sought to determine whether the firm had in fact disclosed all conflicts of interest. *Adair*, 867 F.Supp. at 1113–14. The firm refused to comply with the subpoena and sought a protective order. *Id.* In concluding that the subpoena did not exceed the OIG's authority under the Inspector General Act, the court stated:

> The OIG investigation into possible conflicts of interest directly concerns whether a government contractor receiving federal funds related to a federal program may have committed fraud or abuse or wasted taxpayer dollars by failing to disclose actual or potential conflicts. Any undisclosed ... conflicts of interest could have denied the RTC the independent, loyal and diligent legal representation and advice for which taxpayer dollars were paid, which the [O]IG might conclude constituted waste and abuse. Any miscertification of the nonexistence of conflicts could have constituted false statements and fraud.

*Adair*, 867 F.Supp. at 1117. The *Adair* decision thus also establishes that the OIG–RTC possesses the requisite authority to conduct audits of outside contractors in order to prevent fraud and abuse. The OIG–RTC's audit of H & W does not, the court therefore concludes, constitute an attempt on the part of the OIG to usurp or execute a RTC regu-

14. The court further noted that "while Burlington Northern has prevailed in this skirmish, the Inspector General, the RRB, and the IRS have a decided advantage in the war against tax noncompliance, waste and fraud." *Burlington Northern*, 983 F.2d at 643.

15. The "regulatory oversight" objected to in *Burlington* may be defined as the oversight of compliance by an agency with an act's regulatory provisions, as opposed to oversight of compliance by such agency with the internal policies of the agency. Since FIRREA regulates thrift institutions, not RTC contractors, the auditing of outside law firms does not constitute "regulatory oversight."

16. The court found that the audit conducted by the OIG–RRB had no oversight purpose and that it was "not designed to detect fraud and abuse." *Burlington Northern*, 983 F.2d at 639–41 n. 4.

17. H & W also relies *Winters Ranch Partnership v. Viadero*, 901 F.Supp. 237, 240 (W.D.Tex.1995), to support its argument that the Inspector General's powers are "severely limited." (extending the logic of the *Burlington Northern* case). Yet the use of this case is equally ineffectual since the *Burlington* court itself held that "[the Inspector General Act] gives [Inspector Generals] broad— not limited—investigatory and subpoena powers" 983 F.2d at 641 (emphasis in the original).

The facts of *Winters* are also distinguishable from those of this case. The *Winters* case involved subpoenas issued by the Office of the Inspector General of the Department of Agriculture *directly* to a participant in the federal wool and mohair price support programs administered under the National Wool Act of 1954, not, as in the instant case, a subpoena issued to a recipient of federal funds which assisted the agency in carrying out its activities.

latory function that lies beyond the delegated scope of its authority.[18]

## 2. The Merger of the RTC and the FDIC

 H & W argues that the duties and responsibilities of OIG–RTC, including the issuance of the subpoena, ended when Congress terminated the RTC and transferred its operations to the FDIC. The plain statutory language of the RTC Completion Act indicates, however, that Congress intended that the function and duties of the OIG–RTC would be transferred to the OIG–FDIC and that any residual activities of the OIG–RTC would be assumed and carried out to completion by the OIG–FDIC.

On December 17, 1993, Congress enacted the RTC Completion Act to serve as a transition plan for the transfer of RTC operations and resources to the FDIC.[19] Section 6 of the Act required the FDIC and the RTC to establish an inter-agency task force (the FDIC–RTC Transition Task Force) to coordinate "the transfer of assets, personnel and the operations of the RTC to the FDIC or the FSLIC Resolution Funds, as the case may be, in a coordinated fashion." Pub.L. 103–204 § 6, 107 Stat. 2382, codified at statutory note to 12 U.S.C.A. § 1441a, at 235–6 (1995).[20] Section 6(e) of the Act required the FDIC to submit a report describing which of the Task Force recommendations they were going to adopt. Appendix C to this report states that:

> [The] [r]esponsibility for the functions of RTC's Office of the Inspector General, *and the residual workload* associated with those functions, will be transferred to FDIC's Office of the Inspector General on December 31, 1995.[21]

18. The court additionally notes that in agreeing to the terms and conditions of the RTC representation, H & W was effectively put on notice that it could be asked to provide information other than pamphlets and memoranda describing the firm's conflict check system. H & W knew or should have known that as a contract employee of the government its work and professional practices would be subject to greater scrutiny. H & W's legal services were provided pursuant to legal service agreements, retainer letters, FDIC and RTC guidelines, policies and regulations (12 C.F.R. Part 1606). One such agreement between the FDIC/RTC reads, in pertinent part,

> The general responsibilities of the Firm, including reporting requirements and billing information are set forth in the Guide for Legal Representation (Guide) dated June 1992[.] It is the Firm's responsibility to ensure that the Guide is followed by each person who works on FDIC matters. The FDIC periodically changes and/or modifies the Guide and may also issue clarifications and supplementary instructions, and the Firm hereby expressly agrees to be bound by any such changes, modifications, clarifications, and supplementary instruction. Legal Services Agreement, dated December 12, 1990 (attached to Opp.Mem. as Exhibit E) (emphasis added).

19. The sunset date of the RTC was set at December 31, 1995. Pub.L. 103–204 § 6, 107 Stat. 2382, codified at statutory note to 12 U.S.C.A. § 1441a, at 235–6 (1995).

20. The Completion Act gave the Task force five duties:

(1) Examine the operations of the Federal Deposit Insurance Corporation and the Resolution Trust Corporation to identify, evaluate, and resolve differences in the operations of the corporations to facilitate an orderly merger of such operations.

(2) Recommend which of the management, resolution or asset disposition systems of the Resolution Trust Corporation should be preserved for use by the Federal Deposit Insurance Corporation.

(3) Recommend procedures to be followed by the Federal Deposit Insurance Corporation and the Resolution Trust Corporation in connection with the transition which will promote—

(A) coordination between the corporations before the termination of the Resolution Trust Corporation; and

(B) an orderly transfer of assets, personnel, and operations

(4) Evaluate the management enhancement goals applicable to the Resolution Trust Corporation under section 21A(p) of the Federal Home Loan Bank Act and recommend which goals should apply to the Federal Deposit Insurance Corporation.

(5) Evaluate the management reforms applicable to the Resolution Trust Corporation under section 21A(w) of the Federal Home Loan Bank Act and recommend which of such reforms should apply to the Federal Deposit Insurance Corporation. Pub.L. 103–204 § 6, 107 Stat. 2382, codified at statutory note to 12 U.S.C.A. § 1441a, at 235–6 (1995).

21. Memorandum from Ricki Tigert, Chairman of the FDIC to all FDIC/RTC Employees, December 20, 1994, Appendix C to the FDIC Final Report On the FDIC Transition submitted to the House Comm. on Banking & Financial Services and

It is thus clear from the Act's provisions that Congress specifically intended that the RTC's core functions, operations and programs, including those of its OIG, be assumed by the FDIC.

Fiscal Year 1996 funding submissions for the RTC reveal additional congressional as well as presidential support for the merger of the operations of the OIG–RTC and the OIG–FDIC. The Senate Appropriations Committee report states that "[t]he office of the Inspector General of the RTC will be merged with the FDIC–OIG when the RTC terminates operations at the end of this calendar year." S.Rep. No. 140, 104th Cong., 1st Sess. 139 (1995). The presidential budget submissions for Fiscal Year 1996 also take into account that "in accordance with the RTC Completion Act, the FDIC–OIG will be merged with the RTC–OIG after the RTC sunsets on December 31, 1995." [22]

The legislative record similarly demonstrates that when Congress merged the RTC into the FDIC, it did not intend that the RTC's ongoing activities immediately cease. Instead, it called for an "orderly transfer" of operations that would be as important to the FDIC in its continued work to solve the problems of the failed S & L institutions as they were to the RTC. Pub.L. 103–204 at 12 U.S.C.A. § 1141a pmbl., § 6(c)(1), (c)(3)(B).[23] The OIG–RTC's issuance of the subpoena to

H & W falls within this transfer of operations. The FDIC has a duty as well as an important interest in obtaining enforcement of the subpoena and completing the H & W audit.

Furthermore, nothing in the case law suggests that the merger of the RTC and the FDIC terminated the subpoena power of the OIG–RTC. Drawing somewhat of a tenuous comparison, H & W asserts that the OIG, like a grand jury, loses its investigatory power once its term expires.[24] Although courts have drawn the analogy between the subpoena power of a grand jury and that of an administrative agency, it is generally to underscore the similarity between the two bodies' extensive powers of inquiry, *not*, as H & W suggests, in order to delineate the duration of such investigative authority.[25]

Finally, the OIG–RTC's term did not essentially "expire" when the agency merged with the FDIC. As discussed above, its duties and operations, including any "residual work" such as the H & W audit, were assumed by the OIG–FDIC.[26] Requiring the FDIC to re-issue the subpoena is judicially inefficient. As the Tenth Circuit held in *In re Grand Jury Proceedings*, 658 F.2d 782 (10th Cir.1981), where documents had been subpoenaed from an attorney, requiring the issuance of a second subpoena after the first subpoena expired "would simply result in a

---

Senate Comm. on Banking, Housing & Urban Affairs (attached to Pet. Reply Mem. as Exhibit 2).

**22.** Budget of the United States Government, Fiscal Year 1996, Office of the Management and Budget, Appendix at 1051.

**23.** The preamble to the RTC Completion Act reads, in pertinent part:

An Act to provide for the remaining funds needed to assure that the United States fulfills its obligation for the protection of depositors at savings and loan institutions, to improve the management of the Resolution Trust Corporation (RTC) in order to assure the taxpayers the fairest and most efficient disposition of savings and loan assets, *to provide for a comprehensive transition plan to assure an orderly transfer of RTC resources to the Federal Deposit Insurance Corporation,* to abolish the RTC, and for other purposes.
Pub.L. 103–204 at 12 U.S.C.A. § 1441a pmbl. (emphasis added).

**24.** Many of the cases H & W cites are not only factually distinguishable from the present case but do not even make the link between the administrative agency subpoena power and that of a grand jury. Both *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) and *Loubriel v. United States,* 9 F.2d 807 (2nd Cir.1926), involved the subpoena and coercive imprisonment of contumacious witnesses. In these cases, the courts concluded that the witnesses could no longer be confined once the grand jury expired because they would no longer have the opportunity to purge themselves of contempt.

**25.** For example, in *Morton Salt,* the Supreme Court drew the comparison in order to highlight the broad power that both a grand jury and an administrative agency have to investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." 338 U.S. at 642–43, 70 S.Ct. at 364; *see also Thornton,* 41 F.3d at 1543.

**26.** *See* discussion, § II(A)(1)(b), *supra.*

complete waste of judicial time." *In re Grand Jury Proceedings*, 658 F.2d at 784.[27] Since the OIG–FDIC maintains the same interest in detecting fraud and abuse among any outside law firms that are working or have worked on S & L matters in the past, there is no reason why the FDIC should have to re-issue the subpoena. The changed circumstances of the RTC have not affected the validity of its subpoena.

## B. Relevance

■ It is well settled that a district court must enforce an administrative subpoena if the information sought is "reasonably relevant" to a lawful investigation. *FTC v. Invention Submission Corp.* 965 F.2d 1086, 1089 (D.C.Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) (quoting *Texaco*, 555 F.2d at 872). "Reasonably relevant" means "merely 'that the information must be relevant to *some* (any) inquiry that the [agency] is authorized to undertake." *United States v. Oncology Services Corp.*, 60 F.3d 1015, 1020 (3d Cir.1995) (internal citations omitted) (emphasis in original). The court must defer to the agency's appraisal of relevancy in connection with an investigative subpoena as long as it is not "obviously wrong." *See e.g., Invention Submission Corp.* 965 F.2d at 1089; *Texaco*, 555 F.2d 862 at 877 n. 32; *RTC v. Walde*, 18 F.3d 943, 946 (D.C.Cir.1994); *FTC v. Carter*, 636 F.2d 781, 787–788 (D.C.Cir.1980). The information sought cannot be "plainly incompetent or irrelevant to any lawful purpose of the agency." *FTC v. Texaco, Inc.*, 555 F.2d at 872 (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943)).[28] The Government has successfully demonstrated that the information sought by the subpoena is indeed relevant to the OIG–RTC's investigation.

The OIG–RTC's determination that the subpoenaed information is relevant to its investigative audit of H & W is far from being "obviously wrong." The OIG–RTC must be able to ascertain that H & W in fact revealed all conflicts of interest based on the results of its *own* investigation rather than merely on H & W's representations. To that end, the OIG–RTC's ability to review the original conflicts documentation as opposed to carefully selected samples or summaries of such information is not only relevant but essential since such material constitutes the most reliable source of evidence as to whether H & W complied with the RTC's conflicts rules.[29] The most effective manner for the OIG–RTC to identify whether a contractor is truly complying with the relevant policies is to conduct routine audits and to review information such as the data requested by the subpoena.

H & W asserts that the subpoena is not reasonably relevant to the audit because it seeks information from unrelated third-parties. In support of this contention, H & W relies on several cases where subpoenas were enforced except to the extent that they requested personal information from such un-

27. There is case law specifically supporting the ability of a successor agency to enforce a subpoena issued by its predecessor. In *United States v. Wickland*, 619 F.2d 75 (Temp.Emer.Ct.App.1980), the district court of the Eastern District of California enforced a subpoena issued by the Federal Energy Administration (FEA) even though at the time of the enforcement hearing, the FEA's duties and responsibilities had been merged into those of the newly created Department of Energy (DOE).

28. The court rejects H & W's argument that as to a determination of whether or not the subpoena was reasonably relevant, the court should apply the "arbitrary and capricious" standard set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988) rather than the standard set forth in controlling Supreme Court and D.C. Circuit cases. Indeed, H & W presents no compelling reason—no reason at all, in fact—

why the well-established precedent of according broad deference to an agency determination of relevance should be ignored by the court. The question is whether the OIG–RTC's issuance of the subpoena was reasonably *relevant* to its initial, lawful audit of H & W, not whether its decision was arbitrary and capricious.

29. Government Auditing Standards require auditors to review the original documents used by the firm to discover and identify conflicts of interest in connection with this audit. To meet Government Auditing standards, auditors must review the timesheets to support the invoices comprising the name of the attorney and/or any other professional providing the services in question, the date upon which the services were provided *and the identity of the client for whom the services were provided.* Vander Vennet Decl. at ¶ 21 (emphasis added).

related third parties or that they requested information for some purpose irrelevant to the agency's initial, lawful investigation.[30] In this case, however, the subpoena seeks information directly from H & W, a government contractor and a recipient of federal funds, *not* unrelated third-parties. The subpoena requests neither personal information regarding H & W clients nor any information regarding the nature of H & W's representation or consultation of the same; it merely asks that H & W reveal the *names* of those clients appearing on the timesheets and conflicts questionnaires. This information is clearly relevant to an audit designed to detect fraud or abuse relating to the disclosure of conflicts by outside contractors.[31]

## C. Undue Burden

■ The enforcement of the subpoena would not, the court concludes, pose an undue burden upon H & W. The "burden of showing that a subpoena request is unreasonable is on the subpoenaed party." *Texaco*, 555 F.2d at 882; *Appeal of FTC Line of Business Report Litig.*, 595 F.2d 685, 703 (D.C.Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978) (reasonableness of request is "presumed" absent showing of undue burden or disruption). This burden "is not easily met where, as here, the agency

inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *Texaco*, 555 F.2d at 882. Moreover, agencies are accorded "extreme breadth" in conducting their investigations. *Linde Thomson*, 5 F.3d at 1517. In this instance, H & W has failed to meet its burden.

H & W protests that compliance with the subpoena is unduly burdensome because it would require the firm to obtain consent from a "substantial number" of clients. The OIG, however, has voluntarily narrowed the subpoena to require H & W to produce a client list for only those attorneys that worked on RTC matters, or, in the alternative, to produce the attorney timesheets corresponding to the 40 invoices that comprised the audit sample. While H & W must disclose all client names on these timesheets, the subpoena allows H & W to redact all information regarding the nature and substance of any representation. Thus, the subpoena, as narrowed, would require H & W to contact only those clients whose names appear on the set of timesheets in order to inform them that their identities must be revealed in connection with a government subpoena. Such an imposition, the court concludes, is not unduly burdensome.[32]

---

**30.** H & W relies on three cases. In *RTC v. Walde*, 18 F.3d 943, 944 (D.C.Cir.1994), the court refused to enforce a subpoena that requested personal financial information from directors and officers of failed S & L institutions "for the sole purpose of determining the subpoenaed person's net worth." In *Thornton*, 41 F.3d at 1541, the court held that an agency's "authority to subpoena documents from a partnership solely to ascertain the cost-effectiveness of litigation did not survive the agency's filing of suit." In *In re McVane*, 44 F.3d 1127, 1131, 1138 (2nd Cir. 1995), the court enforced subpoenas except to the extent that they sought extensive personal financial information from directors' spouses and family members. These cases are clearly distinguishable from this case.

H & W also argues that the Fourth Amendment grants individuals greater protection than corporations in personal matters, including "exemption of his private affairs . . . and papers from the inspection and scrutiny of others." Yet the revelation of an individual's identity pursuant to a lawfully issued government subpoena hardly qualifies as an unreasonable intrusion into the private affairs of a H & W client.

**31.** H & W also posits that the information is not "inevitably necessary" to the audit. The issue

presented, however, is whether the information is *"reasonably relevant"* to the investigation at hand.

**32.** Courts have enforced subpoenas imposing far greater burdens upon the parties. *See, e.g., United States v. Firestone Tire and Rubber Co.*, 455 F.Supp. 1072, 1083 (D.D.C.1978), where the court enforced a subpoena although Firestone alleged that compliance would require 100,000 man hours; and *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), where the court enforced a subpoena requiring the production of all of the trading records that had been compiled during the company's history.

H & W further argues that requiring it to reveal client identities is unduly burdensome because doing so will cause a "chilling" effect on its client relationships. The role of the court in determining whether to enforce an administrative subpoena is "strictly limited." *Texaco*, 555 F.2d at 871–72, (citing *Endicott Johnson*, 317 U.S. 501, 63 S.Ct. 339). It is therefore well beyond the scope of this court's authority to determine what, if any effect the disclosure of such information will have on the firm's client

## III. Confidentiality of Client Identities

■ H & W contends that Virginia law relating to the issue of privilege prevents it from disclosing the identities of any non-related RTC clients for whom it has not obtained consent. H & W argues that the identity of its clients is protected by Virginia Disciplinary Rule DR 4–101, which requires lawyers to protect the confidences and secrets of clients "when read in conjunction with certain Virginia State Bar opinions." [33] Federal law, however, not state law, applies in this instance so H & W may not use any state law to prevent disclosure of the subpoenaed information. Questions of privilege are governed by federal law where the underlying action arises under federal, as opposed to state law, as in this case. Fed.R.Ev. 501; see also United States v. Zolin, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989). Moreover, the D.C. Circuit has stated that "the nature of a subpoena enforcement proceeding, under common sense and precedents in this circuit and elsewhere [ ] rests soundly in federal law, and federal law of privilege governs any restrictions on its scope." Linde Thomson, 5 F.3d at 1513. Importantly, the court in Linde Thomson, rejected arguments that state law concerning privilege should apply. The court declined "the opportunity to adopt a particular state's privilege law where, as here, the documents in question are sought by a governmental agency with a nationwide mandate to redress matter of pressing public concern." Id. at 1514.

■ Federal courts have found that, absent special circumstances, client-identity is not protected by the attorney-client privilege.

See e.g., Clarke v. American Commerce Nat'l Bank, 974 F.2d 127, 129–30 (9th Cir.1992); United States v. Leventhal, 961 F.2d 936, 940 (11th Cir.1992); United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 505 (2d Cir. 1991). These courts have found that client identity does not constitute a privileged communication because it does not reveal a "fundamental communication in the attorney-client relationship." See, e.g., Clarke, 974 F.2d at 129. Although "portions of bills, ledgers, statements and time records that reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided ... [do] fall within the privilege," [34] the instant subpoena does not require H & W to disclose such information. Consequently, H & W's clients' identities are not privileged. Moreover, as H & W additionally concedes, if the court enforces the subpoena, H & W's "legal obligation to comply with a court order would override its ethical duties to its client." [35]

■ The court, however, recognizes that H & W's clients, particularly those who have no relationship to any RTC/FDIC matter, have a privacy interest that should be judicially protected. The enforcement of a subpoena is an independent judicial action, and the court is "free to change the terms of an agency subpoena as it sees fit." Adair, 867 F.Supp. at 1119–19, (quoting United States v. Exxon Corp., 628 F.2d 70, 77 (D.C.Cir.), cert. denied, 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980)). It therefore falls within the discretion of the court to go beyond the scope of the subpoena in order to provide measures of confidentiality if it finds "that the agency .... has not provided safeguards sufficient to protect the interests

relationships. The court notes, however, that any effect on H & W's client relationships should be minimal since it is being judicially ordered to comply with a subpoena.

**33.** The Virginia State Bar Opinions that H & W cite interpret DR–4–101 to include the protection of client identity as matter of privilege where: (1) there is a case of double identity involved in the representation of a client (Va.Legal Ethics Op. 1270); (2) the client has specifically requested that such information be held "secret or inviolate" (Va.Legal Ethics Op. 1285); and (3) the client is recipients of legal aid and has had its case closed either through negotiated settlements

or by administrative decision (Va.LegalOp. 1300).
H & W's argument is considerably weakened by the fact that, as it so acknowledges, DR 4–101 does not specifically prohibit the disclosure of client identities as a matter of privilege and also by the fact that the Virginia State Bar Opinions it cites apply to narrow circumstances distinguishable from this matter.

**34.** Clarke, 974 F.2d at 129.

**35.** Opp.Mem. at 13 n. 13, citing Va. DR 4–101(c)(ii); accord ABA Model Code of Professional Responsibility DR 4–101(C)(2).

of [the parties] at risk." *Id.,* (citing *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d 966, 974 (D.C.Cir.1980)). Indeed, "in appropriate circumstances, [the court] may modify a subpoena [ ] to incorporate a confidentiality agreement." *Id.* (citing *Exxon Corp.,* 628 F.2d at 71).

Presently, the Government has made no assurances that it will protect the information (including the identities of clients) disclosed by H & W (or any other information for that matter). In light of the fact that Congress has found that confidential information obtained by the RTC has "leaked" in the past, it is appropriate for the court to ensure that the confidential information of innocent parties be protected.[36] Parties have a legitimate expectation that "even the fact of their engagement will not become a matter of public knowledge." *Id.,* (citing October 20, 1994, Hearing Transcript at 35–44). The court shall therefore order the parties to enter into a confidentiality agreement. The parties are to attempt to reach this agreement between themselves. In that regard they are referred to the agreements appended to the *Adair* decision as Appendices A and B.

## IV. Conclusion

The government has successfully demonstrated that the subpoena has been issued for a lawful purpose, is reasonably relevant to such purpose and is not unduly burdensome on H & W.

Accordingly, it is this 3rd day of January, 1997,

**ORDERED** that the Petitioners' motion to enforce the subpoena *duces tecum* be and is hereby **granted;** and it is

**FURTHER ORDERED** that the parties report to the court 30 days from the date of this order regarding their progress in executing a confidentiality agreement.[37]

**SO ORDERED.**

---

36. At a 1994 Senate Hearing before the Senate Banking, Housing and Urban Affairs Committee, the Interim Deputy Chief Executive Officer of the RTC, John E. Ryan admitted that "we haven't been keeping those matters confidential. It's almost a certainty around the RTC that any matter that has any kind of public interest at all is leaked to the press prematurely[.] And we've had a lot of premature leaks of very sensitive information." Ryan stating that although "the RTC has a responsibility to keep ... information confidential ... [the RTC] breached that responsibility." *Adair,* 867 F.Supp. at 1119 (citing Hearings Relating to Madison Guaranty S & L Before the Sen. Comm. on Banking, Housing & Urban Affairs, 103d Cong., 2d Sess. 48–49 (1994)).

37. The parties shall file a joint status report.